Good morning. I please the court, Gwen Freeman, for Ms. Trujillo and the Thachers for appellants and cross-appellees. I would like to reserve 10 minutes then for sort of reply and rebuttal and address first during this time period the District Court's erroneous dismissal of the bad faith cause of action on summary judgment. Summary judgment is of course a drastic remedy and in this particular case what we have is a somewhat tangled factual web but if you look at the basic parameters of what this case is about, it's a very classic swearing contest. He said, she said, he said, she said and that is a jury question and it is very important that the jury get a chance to decide these questions of fact because that is a bedrock of our system. Let me ask you, you have a judgment now. That is correct. How much is that judgment for? The judgment is currently for 700, let me see, the judgment is for, so it's 18,000 for the defense cost, 100,000 under the CPL policy and 415 on the umbrella policy with interest at 10%. So it's, I think ultimately it was something in the $700,000 range. So, yeah. And the underlying injury that was caused by tripping over the sprinkler was a broken arm or a broken wrist? That is correct. I refer to separately, is it wrist or arm? Wrist, it was her wrist. So we're up to 700,000 bucks for a wrist? That is correct. And you'd like some more? Yes, indeed. And I tell you, Your Honor, this is one of the most egregious bad faith cases I have ever seen and I've been practicing for 30 years. You have some doubt about the amount of the judgment. This has been all states' blind spot from the very beginning. Ms. Trujillo lost a very valuable government pension. She put in evidence, expert evidence as to what that was worth as well as the surgeries that she suffered. She cannot work again and she has not worked again. The decider of how much the value of that claim is was the arbitrator. We can't sit here today and this court cannot sit here today and make any judgment about it. It is a complete violation of the full faith and credit clause. It is a complete violation of the whole notion of courts of appeal and what jurisdiction they have and don't have. And the fact that all states had every opportunity in the world to come in during the trial to say, hey, you know what, your expert witness was wrong, because really the pension was only worth this much, and really she shouldn't have spent so much in surgery. And, hey, she could be rehabilitated. They had every opportunity to do that. They shouldn't have had the opportunity to do it, but they did. They came up with nothing. They have no evidence that impeaches that verdict in one iota. They wanted, they said, oh, you should cross-examine Ms. Trujillo on this, on her claim of damages. Well, they did cross-examine her on her claim of damages. And guess what? The jury believed her. That's what juries do. And that is why that amount of that judgment is completely immune from scrutiny here. What's more, the fact that all state has, in my view, the gall to criticize that judgment, which they allowed to happen by wrongfully denying the defense, is such a classic bad faith case that it falls right in line with Egan and Safeco and all of the other cases that we cited in our brief. Their actions were egregious. They, the jury, and of course we know this now, which does not go to the summary judgment, but in the summary judgment it was possible that the jury could have found all state's witnesses lied about the non-renewal. And guess what? The jury found that all state witnesses lied about the non-renewal. And if that isn't bad faith, I don't know what is. This is a case that cries out for punitive damages. What's more, they have made us spend an enormous amount of attorney's fees in getting to this place where we are here today, instead of just paying the judgment, which they certainly could have done back in 2007. Let me ask you this, counsel, because you have the opportunity to present all of those arguments and the jury obviously found in the Thatcher's favor. But in looking back to the district court's summary judgment motion, you had a situation where from the get-go I think the insurance company and the parties themselves frankly reasonably concluded that this was not the type of injury, the risk factor that would somehow potentially trigger the umbrella policy, or at least initially it was a $14,000 risk injury and that was the extent of the medical damages. I think at one point the parties were talking about settling for less than what the CPL policy limit was going to be. And from the get-go, Ms. Trujillo's statement of damages was somewhere in the range of $300,000 plus or so. Correct. So that's the situation from the insurance company's perspective. The insurance company thought it was out of it. The parties go to arbitration and the arbitrator awarded it half a million plus in change. There's 100 days for Allstate to move to vacate that arbitration award, and five days after that deadline expired Allstate then gets notice for the first time. I think the date was on August 7, 2007. They were finally notified, hey, now we've got a half-million-dollar judgment. Allstate's now on the hook for that judgment. Within a month of that, Allstate sends a letter issuing its reservation of rights, provided the Thatcher's with counsel, and basically say we've got to investigate this. We need to look into how a $14,000 risk injury got turned into a half-a-million-dollar judgment, and they filed a declaratory relief action to do that. Aren't they entitled under California law to proceed in that fashion? And wasn't that what the district court was relying on in saying that this is a legitimate dispute and so, therefore, the declaratory relief action was appropriate? Backing up to your first point that Allstate looked at this and decided that it did not meet the level of the $50,000 threshold level of the umbrella policy, that is nowhere on the record, except for Ms. Cervantes saying it way after the fact. Look at her claim notes. It doesn't mention one tiny word about her looking at the umbrella policy and deciding that the claim could not possibly meet that threshold. What's more, it has to be, can't meet the threshold as a matter of law, not, I sort of think it probably won't reach that level. It has to be absolutely impossible. For example, if, in fact, it had been sent back to limited jurisdiction, that would certainly have been, as a matter of law, you can't get more than $25,000. But that didn't happen. So she was unreasonable at the get-go by denying the defense under the umbrella policy, even if she reasonably believed that she could have denied it properly under the CPL policy. She was unreasonable for not finding out why the statement of damages said $300,000, not calling up a plaintiff's lawyer and saying, hey, $300,000, what are you talking about? This should be in limited jurisdiction. And if she had done that, Mr. Merlis, as he testified, would have said, no, we have evidence that she lost her pension, she's not employable again because of her other physical ailments, she had a great job that was perfect for her at the DMV, and these damages are real. These damages are, we're going after them. And that's all it would have taken. Then what the insurance company should do at that point is say, I'm going to fight this case. No, Mr. and Mrs. Thatcher, we've got your back here. We will fight this case and we will bring it in for less than $300,000. But they didn't do that. They just said, no, I don't think so. It's no liability coverage. We're not going to defend you. We're not doing anything. We're not even going to defend our own interests under the umbrella policy. If they wanted this case to be under $300,000, they thought they had such great evidence. Time to come in was in 2005, not 2007. And you do mention the fact that it was 100 days after the arbitration. That is true. That happens to be just a coincidence. As Mr. Reynolds testified, he did not have that in mind. But Allstate hasn't shown what they could have done if they had gotten it on the 90th day or the 80th day or the day after. They have no evidence to show that that was not a proper, completely proper verdict in judgment. And so I would like to reserve some time for the rest. But if I can ask, Judge Ferguson, you might have noticed it doesn't cut people off very quickly. So you're probably going to get a chance to say what you need to say. There are two things that bother me about the case. The first one is what you've just indicated. It does seem to me that it didn't take much for Allstate to realize that this might well go over $50,000. And that if it might well go under $50,000, I think the duty to defend is likely triggered. That's your point. That's correct. But the other thing that bothers me is that we've got an arbitration in which Allstate's interests are deeply implicated because there's going to be a judgment against them based upon the arbitration. And Allstate is nowhere to be found. And we have the two parties, the quote parties, to the arbitration, the Thatchers and the Trujillos, whose interests at this point are coinciding in having a large amount. That one bothers me, too. It does, but it's California law. And California law bothers you, that it is 100 percent within California law to have such a proceeding. In fact, they could have stipulated to a judgment, but they didn't. They had a neutral arbitrator. If Allstate wanted to have an attorney there, they could have. They had their chance. Notice and the opportunity to defend, they had those two things. If nobody was there for the Thatchers, that's on Allstate. If it bothers you, it should bother you that Allstate let that be the case. Now, did Allstate have the opportunity to participate in the arbitration? Absolutely. When they denied the defense initially, they gave up any right to hear anything more about anything that happened. Did they know that the arbitration was going on? They did not know that it had been sent to arbitration. So how can you say they had the opportunity to participate in the arbitration if they didn't even know about it? Because if they had an attorney, they would have known about it. Because that's what happens when you turn down people and insure it on the basis of lack of coverage, because you've sent out a notice that the policy is no longer in effect, and you have no proof of that. And those people say they never got the notice, and there's nothing in Allstate's records to show that any mailing ever took place. Isn't that right? That's correct. You are right. And Allstate maintained that it had taken place, but it's Allstate's burden to prove that that notice went out. Right. And they had no evidence. They didn't. None whatsoever. They said so. And so Allstate should have known that this woman was injured and that this process that was followed here is one that's commonly employed when there's a denial of coverage. Absolutely. It's customary. The answer is they then go into arbitration, which is a known remedy, and it's used in these situations. And the matter goes to the arbitrator. The arbitrator is an independent body or person, and that person makes a decision. And then on the what was the overall amount of the umbrella policy? A million. A million? Yes, the limit was a million. All right. A million dollars. But they decided that, well, the comprehensive policy has been terminated, but they didn't have proof of that. And California law requires them to notify and to be able to prove that the termination letter went out. Okay. Then they've got Then someone made the decision that there's a $50,000 deductible, and there's no way that this claim for damages would anyway exceed 50,000. So they took a chance on that. So they didn't extend a defense to these people. And there you are. You have the Thatchers. I guess their main business was renting out some of these properties. They're older people, right? And they're worried about it, too. And so somewhere along the line, someone suggested that, well, you can have a bad faith claim against all state, but the thing you need to do is reduce it to a judgment. Correct. And that's what they did. They went through arbitration. Then they went to the court, and the superior court made the decision that would enter judgment on that amount, whatever that arbitration was. Correct. And it's a State court judgment. So if all State had been awake and had any sensitivity towards their own clients, their own assured, they would have been fully aware of, one, their obligation to extend a defense here, and they wouldn't have sloughed off this business about the million-dollar blanket coverage. It was all there. Correct. And also they knew it. And so they just ignored the whole thing and let these people suffer by paying the bills and everything else. Was there medical coverage on this property? There, I don't know. But I would assume so because it would have had to have been a standard form fire policy, which would have had some medical coverage, but not enough. I mean, it was a rental property. Yeah. Wasn't it? But, see, it wasn't. See, that's the thing. It was originally, it was a landlord policy on these properties. At some point, all State forced the Thatchers into accepting the CPL policy, which is, in essence, more like a standard fire policy, and then they wanted to change back to a landlord policy. You know, I don't know why. The underwriting reasons escape me. So you don't know whether there was medical coverage on this property? I don't. I mean. Not offhand. It's pretty common when people have insurance that covers their property, their own home or any property they have, is that there's a provision for payment of whatever it is, $5,000, $10,000 in medical. Right. It would have been in that. Huh? It would have been in the $5,000 to $10,000 limit range, if not even smaller. I mean, some people don't, you know, have $1,000. The answer to that is I don't know. All right. But I do know that Ms. Trujillo was genuinely injured and she definitely had to have a surgery, and she certainly doesn't have. Nobody. The reason why her medicals aren't bigger is because there's nothing they can do for her. She cannot now use that hand to type. And that's you can't rack up medical bills when there's just nothing to do to read up. Oh, no, because I was just asking if there was medical coverage. Because if there's medical coverage, it's payable regardless of liability. Correct. Yeah. That is correct. Yeah. So. But the other thing to remember about this is that it's, you know, we're assuming here that there actually was some real process on the part of Sandy Cervantes, the claims adjuster, as she testified, that she made a conscious decision that the case would not be worth more than X amount of dollars. I do not believe that to be true. And I don't think the jury would either if that question had been placed to them, because they believed Mr. Scheer, who said that conversation never happened. And if you look in the claim notes, the only reference there is a conversation with Mr. Scheer where the only thing he says in the claim notes is, you know what, it's going to cost you more to litigate the coverage issue than it is to just pay the claim. Very prophetic. Very prophetic. All state said, we don't do that. We don't care. And that is the only mention in the claim notes of any concept of how much that claim was worth. That's bad faith as well, because according to Wilson, you need to do an adequate and thorough investigation. This is a paradigm of a sloppy, narrow-minded, narrow-focused investigation that would never pass. You want to save time. I wasn't. I was just trying to bring some things out. You bring this over. Thank you. May it please the Court. My name is James Fitzgerald. I'm with Strzok & Strzok & Levin on behalf of Allstate here today. Justice Ferguson, let me answer first a question you ask, Ms. Freeman. The policy, the CPL policy, by its acronym, is a comprehensive personal liability policy. It does not provide medical coverage. It only provides liability coverage. Okay. That's all right. Right. Exactly. You know, you try to raise your own insurance policy if you get baffled half the time. Right. I just wanted to make sure we were clear. No, no, no. There are three things here. I mean, I know about it because I got it on my home. You got one as well. Somebody comes in the house and falls down and hurts themselves, they don't have to worry about this or that. They'll just pay the medical bill. Let me focus on what we think is the most important question here, which we don't believe. Is there anything I've said about how this all works out? This process, when the company doesn't come and extend coverage and what the parties do and go to an arbitrator and get the superior court to make, to enter judgment. I mean, that goes on all the time. Well, I don't know about all the time, but it does go on. Well, it's common. It's common. It probably comes before the court hearing. No, no, no. In my own experience, it's common. Oh, to have an arbitration. Sure. No, no, no, no. No. If you've got an insurance company and they don't come forth and take over the defense and they deny whatever it is, coverage, because they've sent out cancellation notices and whatever, and you have a situation like this, the common approach is for the two of them to go to arbitration, the homeowner and the injured party, to go to arbitration and get that reduced to a judgment. I wouldn't say it's common. It happens. It happens often. It happens often, but it also happens that they go into litigation or they just go to a mediation and get it resolved. Yeah. So there are three different ways. Yeah. Sure. Okay. That's true. All right. Now, Allstate, when they denied coverage under the comprehensive policy, they understood that they were required by California law to send out a notice. Under if they were not renewing the policy. Absolutely. Yeah. Absolutely. And they did. Huh? And they did. Well, the jury found they didn't. Well, their evidence. What evidence did Allstate have? Did it have a copy of the notice? Yes, it does. It's in the file. It was in the file. Did it show it was sent to these people? Yes. It was all done by a computer, wasn't it? The letter is in the file. It's a computerized letter that gets sent out. Did it show that it was sent out to these people? Yes. Allstate has a record that it was sent out by regular mail. That is what the insurance code requires. It doesn't require certified mail, FedEx, hand delivery, or anything else. The insurance code is what indicates it. Okay. None of these folks said they never got the notice. Well, sure. They said they never got it. Sure. They said they never got it. But there was other evidence. Yeah. But the jury didn't believe they got it. For whatever reason that's suggested. Whatever it is, the jury ruled against it. That's right. So you're stuck with that. So quit arguing that they never got it. I understand.  I mean, we know how the world works. I understand. The only thing I would say is that as a matter of law, the insurance code provides the obligations to the insurer in what it should be sent, how it should be sent out, how it should be communicated. And there's a lot of other obligations. Okay. Now, that's true. Now, the point that I want to focus on, though, is what Justice Fletcher mentioned earlier. You know, I hate to interject. Everybody keeps calling me Justice Fletcher. I'm sorry. There's an old joke. There is no justice on the Ninth Circuit. There are only judges on the Ninth Circuit. We can tell you've not been at the Ninth Circuit very often. The court of appeals guys, for some reason, they get to be called justice. They were judged. Sorry. Meyer, I apologize. I apologize for interrupting. No, that's quite all right, and I appreciate the distinction. But what Judge Fletcher did say, and you know who originated that phrase? An old-time insurance defense lawyer named Walter Ely. Oh, yes. You know Walter? I know Walter. He's a little older than me. That's what Walter used to say. I never met him. There ain't no justice on the Ninth Circuit. Yeah. Walter was my buddy. But you've proved him wrong. What? You've proved him wrong, though. Oh, no. I'm not Walter. But let me go back to Judge Fletcher. He's not around anymore, but he's watching. He's watching, I'm sure. What Judge Fletcher mentioned before, $700,000, $500,000, whatever, for a $14,000 wrist injury or wrist fracture. The problem with this case, and has been right from the start, is that there never was any evidence introduced at trial or in the arbitration to distinguish between what damages are attributable to a wrist fracture versus the other things that were submitted, irritable bowel syndrome and back problems, disc slippage, and all of that, which, Mr. Heal, had been sidelined on disability for at least five of the last ten years. You gave up that opportunity, you know, because you refused to, Allstate refused to extend a defense here, you know. The same question, though, still remains. The arbitration award, even so, has to be. Are you collaterally attacking the arbitration award? The arbitration award has to be supported by evidence, and it has to be, they have to prove that it's not unreasonable or the product of fraud or collusion. That's what the district court recognized, and that's what was left. The question here is, and what the jury was, was it unreasonable? Now, the court, the district court judge, after looking at all of this going through the summary judgment motion, and even after hearing all the evidence at trial, concluded that it was, even if he hadn't. The court here has to look at what the evidence was that was produced. It's a de novo review, because it was a declaratory relief claim that Allstate originally brought. And there is no evidence, looking through the record. But, you know, isn't there a bad faith claim here, too? Well, there is a bad faith claim, and I'll get to that in a moment. You know, that opens up the sky. Well, it only opens up the sky, and here, that's assuming that you reverse the problem. It's a cloudy day. You can't go too high. I understand. But the point is, there is no distinction. No one here, no one in the courtroom downtown, and that arbitrator, no one could testify, even Mrs. Trujillo and her lawyer who was on the stand, Mr. Merlis, when asked, none of them could distinguish between what damages of that $515,000 award were attributed to a wrist injury versus palatable nerve syndrome versus back injury. And I'm no doctor, but I know that a wrist fracture has nothing to do with the other two. It doesn't have to do with loss of earnings or potential earnings, a wrist fracture. By itself, it may. That's the problem, though, Your Honor, is that they lumped it all together. They did that for a calculated reason to drive up the award. And then pin it on the insurance company. That's what they did. That was clear. And that's why we were left with a $515,000 arbitration award, which the district court judged. No, no. You were left with it because you didn't follow your obligation as an insurer to extend the defense. And, you know, that's a dangerous thing not to do in this world today. The court found, the trial court found that it wasn't a dangerous thing to do and it was a reasonable thing to do. Because there was evidence in the file and all states believed that the CPL policy had been canceled and the district court found, consistent with true California law, and I dare say through most of the country, I believe, that there was no duty to defend under the umbrella policy. Okay? That's how excess insurance works. There was no duty to defend. So there was no, and in fact, interestingly enough, we've heard as well that there was a breach of contract of the CPL claim. Setting aside whether there was a legal duty to defend under the excess policy, because you're right, I think California does draw a distinction in the duty to defend for the umbrella policy versus the CPL policy. But here I think all states took a substantial risk because you should know having both the CPL and the umbrella policy and that there would be all kinds of disputes over whether the CPL policy was properly canceled. In fact, the Thatchers disputed that. So to send out a letter that addresses only the CPL policy, making no mention of the umbrella policy, and then standing back and letting the Thatchers and Trujillos work it out, that was a risk. In the real world, that was a risk by all states that resulted in a half a million dollar judgment in which all states had no participation. So it's kind of a you snooze, you lose situation. Well, not necessarily. In the real world, most insurers who had gotten that, who were involved in litigation, would have gone to their lawyer and said we need to respond back to this letter and tell them why they're wrong. All states heard nothing. Nothing at all. No lawyer ever wrote a letter saying we think you're wrong, we're going to arbitration, we think you're wrong because of this. Nothing at all. Instead, they went, they did their side deal, they got it up as high as they could, they submitted it on a trumped-up basis, and what do they do? They wait more than 100 days, and on the 105th day, that's when they first notify all states and tell them, oh, now you're stuck. Okay? So was it reasonable for all states to do what they did? All states believed at the time when it wrote that letter that it was correct, it had in its file. The insurer didn't respond back and say, no, you're absolutely wrong or anything like that. They didn't file a declaratory relief. Nothing. Not a response. Nothing at all. Well, they were, look how they were treated by all states. All all states said was our information, everything we have says that we non-renewed the policy and you didn't get a renewal underlying policy. That's it. Let me ask you this, and this may be my sort of a hole in my knowledge of California law with respect to the umbrella policy. I understand that the umbrella policy picked up only after $50,000. Correct. Was the coverage of the umbrella policy conditioned upon there being an existing comprehensive policy, or was that umbrella policy in existence and provided the obligation even after the cancellation of the comprehensive policy? It requires an underlying policy. Okay? But if the policy isn't there, then it still picks up after $50,000. However, it doesn't, what we call the insurance, it doesn't drop down and take the place of the primary policy. Got it. So in other words, even if you're right that the comprehensive policy was properly canceled, the obligation of the umbrella policy does kick in as soon as there's a recovery of more than $50,000. Correct? Once there's a recovery of or once there's a judgment or reward of more than $50,000, then the policy would kick in on an excess basis. That's correct. Well, is there any obligation to defend under the umbrella policy if there's a realistic threat, say, of a damage award of $100,000? No. Not until under primary policy, not until $50,000 have been paid. Because under primary policies like these, there's two obligations. There's an obligation to pay for the defense and provide the defense and then to pay the limits. The limits are $50,000. The defense obligation is by itself. You could spend $300,000 in defending a claim and you'd still only have to pay $50,000. No, no, I got that. I'm going to make sure I'm understanding what you're telling me. Are you telling me there's no obligation to defend under the umbrella policy? In this case, absolutely. No, no, I'm talking about the policy generally. Somebody comes in and they say, listen, I don't have anything except the umbrella policy. I've got a claim against me for $100,000. I would like you to defend me. And does all State in that circumstance have an obligation to defend? No, it does not. Here's where it comes in. It does not because? Because it's not required to provide a defense unless the underlying $50,000 limits have been paid. So let me make sure I understand. So your reading of the policy, I don't have it here in front of me, but your understanding of the policy is in order for any obligation to defend to kick in, there has to have been an initial payment by the insured of $50,000? An exhaustion of the underlying limits, which is $50,000. But then, so for example, the Thatchers had paid $50,000. This is now your construction of the policy. If they had paid $50,000 and then come to you for and asked for defense, you would have been required to provide it? Yes. I'm asking if $50,000 had been paid pursuant to some sort of a judgment, a legitimate payment, yes. A payment has to be legitimate, obviously. But do you... But now you're backing and forthing on me as to whether or not it's paid pursuant to a judgment or paid properly just because there was a, you know, there was a real claim that's obviously worth more than $50,000. Correct. But the simplest way to answer... And so you say, right. In either event, whether judgment or good faith payment of $50,000, at that point the obligation to defend kicks in? On the umbrella. On the umbrella? Right. And why doesn't Allstate say anything about that to the Thatchers? I'm not sure that it... Well, in this case, Allstate believed only that it was, that the claim was under the CPL because all indications that it had were that it wasn't going to go beyond the $50,000. This is typical. Excess carriers typically do not put forth letters and explain how their coverage applies until actually something has been triggered. That's typically how it works. But if I could... But Allstate wrote, Allstate wrote the excess policy, right? The umbrella policy. Right. And so when Allstate, when you got this notice that we're canceling, you know, the comprehensive policy, then that has an effect on the umbrella policy. Right? It may have an effect, yes. It may have an effect on the umbrella. Right. So when you send out that cancellation of notice that the other folks say they never got... Right. ...and the jury didn't believe that you proved that it was sent out, does that letter, that form letter say if you've got an umbrella policy and you have, we see you have an umbrella policy, $50,000 deductible, so we just want to call your attention to the fact that with the comprehensive policy that we had, how much was that policy? What was the amount of it? The $50,000. Comprehensive. I mean, the CPL policy was $100,000. $100,000. Right. Okay. So, you know, we're vacating that $100,000 policy. Now you've got an exposure, uncovered exposure of $50,000 in your umbrella policy. And that is why when Allstate sent out the notice of non-renewal... But they say they never got that notice. I understand. We have to take that as a given. I understand. But you're asking about why Allstate didn't or didn't do something. Yeah. What I'm... I'm just asking you in that notice... Right. ...that they say they never got, but you said they sent out and the jury found that they didn't agree with that. Is there something in there saying to them now that we're cancelling the comprehensive policy, the $100,000 policy? Now you've got a $50,000 exposure on your umbrella policy. What it said was we are non-renewing, not cancelling, non-renewing. Non-renewing. That means you're not going to have it anymore. And you need to look at other coverage to replace that. And there was a telephone call and there was testimony from their agent that he called them to tell them about replacing that underlying coverage so that they wouldn't have that gap in insurance and that Mr. Thatcher said, no, no, no, that's too expensive. I don't want to do that. That was the testimony. The jury didn't believe that. Well, it didn't... Yeah. ...that wasn't at issue whether or not that conversation took place about replacing the coverage because it really was an issue. Yeah. Yeah. Counsel, can you clear up a factual discrepancy for me? Because I don't know where this $50,000 limit to the CPL policy comes from. I'm looking at ER 1775 and it talks about $100,000 liability policy. And the district court judgment, which is at docket 173, talks about the CPL policy limit being $100,000. Am I missing something here? I don't have this. Are you looking at the umbrella policy? Well, I'm looking at the district court's judgment after the jury rendered its verdict on the 11580 claim. And the district court talked about judgment is entered. All State owes Defendant Thatcher $18,399.59 plus interest. And then the next page, All State owes $100,000 the CPL policy limit on the 11580 claim. So that tells me that the CPL policy limit was actually $100,000.  And just in case the district court made a mistake, I then checked the excerpts of record that's submitted. And I'm looking now at ER 1775. And you tell me if that's not the CPL policy. It's policy number 37177. I corresponded the policy number with the declination letter that All State sent out. So I think I'm looking at the right policy limit. And I don't know where the discrepancy comes from. The policy limit on that document says? The documents that you submitted and as suggested by the district court judgment tells me that the CPL policy limit was $100,000 and not $50,000. That is correct. But everybody's talking about a $50,000 CPL limit. So I'm wondering what I'm missing here. Can you help me out on that? I don't have the CPL policy in front of me, Your Honor. But I know there's no question and we all stipulated that the CPL policy limits that ended in November of 2003 had a $100,000 policy limit. There's no question about it. All right. Because everybody's talking about $50,000, but you've clarified for me the CPL policy limit was actually $100,000. Yes. Because I think it makes a difference in terms of All State's assessment of whether the umbrella policy would potentially be invaded. Well, the umbrella policy has a $50,000 retained limit. Okay? So that if the umbrella policies oftentimes do have different limits because it covers more than just one policy. That's why they call it an umbrella. Gotcha. It's triggered at $50,000, but the CPL policy limit was $100,000. Right.  I understand. Thank you. I think that the real question here again, though, goes back to there is no evidence in the record of this distinction. And that's why the judge, the district court judge, used words and terms repeatedly about why the arbitration award was unconscionable. It was unfair. It was, it would be a miscarriage of justice to apply it. And ultimately, our position with him was if you find that, then it's a declaratory relief. You don't even need a jury. It's an advisory jury. That should be the ruling because there's no evidence to support it. And there would be no evidence to support a jury award that that arbitration award was not unreasonable. Nothing. There's just nothing there. And, you know, Ms. Freeman is not going to be able to come up and tell you this is what was for this, and this is what was for the irritable bowel, and this is how we segregated 515. It says no one could do it, and we ask them on the stand at trial. Even Mr. Merlis, the plaintiff's underlying counsel, could not do it. And therefore, I would, if I could, I'd like to just read one thing. There's one case that really supports actually both sides on a lot of issues here. And the district court noted it in the summary judgment ruling. And it says this. It's called the Pruin case, P-R-U-Y-N, 36 Calab, 4th. And at 518, it says, And I underscore that. Proportional tortfeasor. The proportional tortfeasor share here is of the property that Mr. Thatcher owned when someone tripped over his sprinkler head, namely Ms. Trujillo. That's the proportional share. And Pruin says they have the burden of showing that a $515,000 award, which was basically a settlement, and they went through the charade of doing a stipulated judgment and all, that that is proportional to a $14,000 medical damage in tripping over a sprinkler head. And that they cannot do. And that's why this judgment cannot stand. Let me read to you from the umbrella policy. It says, and I'm on ER 1820, it says the heading is Defense We Will Provide. And it says, All State will defend an insured person sued as the result of an insurance covered by this an occurrence covered by this policy, period. We will not defend any insured person against any claim for penitentiary exemplary damages. And then it goes on. I see nothing in this part of the policy that says we will only defend after you've paid the $50,000. Where is that? And, Your Honor, two paragraphs down. Okay? Read it to me. If the insured person fails to maintain the required underlying insurance, we will not defend. Well, we will not defend for any amount of damages falling within the required underlying insurance limits. That sounds as though if there is an underlying policy, we're not going to defend you up to the $50,000. Until the $50,000 has been paid. It doesn't say that. But that's how excess insurance works. And if I can explain, Your Honor. But there's nothing in here that says we may hear from the other side. She may agree with your construction of the policy, but I just don't see it in the policy. I think where we're missing is this. Where would there be a situation where an insured would have a liability and it would get $50,000, but the case wouldn't be over it? An example. Let's say you have two people. Let's say you had two people who were injured at the Thatcher's residence, okay? Something happened to both of them, husband and wife, for example. And they both turned around and sued and were injured as a result of it, okay? And both of them, let's say, had claims in excess of $50,000. And one of them was agreed would be settled out. And the insurance company that had the $50,000 limits said, okay, we will pay. That's paid. The other, it's still one claim by them, that those limits are gone. You know, I'm not interested in that. All right. But let me come back to the same paragraph you pointed me to. If the insured person fails to maintain the required underlying insurance, in this case, is there any required underlying insurance? Yes. That's the CPL. Well, you say, oh, you're saying then that if that insurance policy is not maintained, then there's no obligation under the insurance policy, under the umbrella policy at all?  No obligation to defend. What do you mean by required? No obligation to defend. Like I said before, the excess carrier umbrella doesn't drop down. Well, the phrase is, if the insured person fails to maintain the required underlying insurance, what is the required underlying insurance and why is it required? Where is it specified that it is required that you maintain the underlying comprehensive policy? Is, I believe, the definition. Yes. I have it at ER0-2251, my copy of the policy. Just tell me the provision within the policy. Sure. It's under the insuring agreement and it's a page 3 if you look up at the top in the right-hand corner. Yeah. Okay. So? Okay. Under 1-2, the third paragraph, it says, This policy provides only excess insurance. It does not contribute with any required underlying insurance or other insurance which applies to an occurrence. Yeah. Okay. I'm still waiting for you to point to this. It is also, it also is excess to any retained limit an insured person assumes. Right. But I'm still waiting for you to point me to the provision of the policy that tells me what the required insurance is or that I even have to require it. You mean the underlying insurance? Well, the phrase, the policy keeps using the phrase required underlying insurance. Okay. So where's the requirement that I maintain the underlying insurance? Two pages before page 1. Okay. Where they have the table of contents. Okay. Required underlying insurance amounts. Okay. So I'm on the front page. Where are you on that? That's at page 1. And then it directs you to page 11. Okay. I'm on page 11. Okay. All right. Residents, premises, and residents, employees. So you must maintain. Okay. You must maintain. So your argument then is that because the underlying comprehensive policy has not been renewed, the umbrella policy doesn't cover at all? No. The umbrella, and we've never said this, the umbrella policy would apply, but only on an excess basis. The insurer has to, it's like you have a gap in your insurance. It would be no different than if you had an auto policy that gave you $100,000 in coverage and then you got an umbrella policy. No, I got all of that. But what I'm trying to figure out is whether you have an obligation to defend prior to the fact of them having paid off $50,000. And I'm having trouble reading the policy to say that. And I believe that that language in the insuring and the defense we provide, read in conjunction with the underlying limits, basically says exactly that, that you, we will only come in to defend if the underlying insurance has been exhausted and it cannot be exhausted unless delimited. I've got the argument. Okay. I think I'm. Okay. Must be out of time. Yeah, you are. Okay. Thank you very much, Your Honor. We would submit that the judgment be reversed. Thank you. To answer your question, I do not agree with that. Interpretation of the defense we will provide provision. I think it is a ridiculous interpretation. I think if they wanted to say we have no duty to defend until $50,000 has been paid, they would have said that. If they wanted to use the word exhausted, it's a very well-known term in the insurance industry, and I think they would have used that term. What they said was we will not defend any insured person for any amount of damages falling within the required underlying insurance limits. And as I pointed out to the district court and in the briefing in this court, that is a very ambiguous phrase because a case goes on, and as in this case, most cases you don't know how much the damages will be until the end of the case. The duty to defend is at the beginning of the case. So it cannot mean what they say. What I think it could mean is, for example, if we had a case that was in fact a limited jurisdiction case that did not seek damages in excess of the limit, that's what it means. And with respect to the required underlying insurance provision, that underlying insurance provision is with reference to indemnity. And I do agree that if there had been no underlying insurance, there would be a 50,000 gap, 50 because it's a threshold, even though the policy they got was actually  But here's what happens if any of your underlying coverage limits are used up, reduced or canceled, so you don't have them anymore. This is what happens. You must try to replace the coverage, and you must notify us immediately. That's all that happens. That's what happens. And with respect to the distinction that has been made in California law in terms of excess and primary, you have to be very careful because the law is extremely clear on one point, and that is it's the language of the actual policy that applies, not general principles. With respect to the citation to the Prune case, this was not a settlement. This was a verdict of the arbitrator. It is not subject to collateral review. If they had wanted to oppose the arbitration in State court, they could have done on, really, here's, you know, their statutory things, that the arbitrator exceeded his power, that the award was procured by corruption, that the award was issued by an arbitrator not qualified. Under California law, you cannot attack the arbitration award on the basis that we don't like the way he wrote it up and we can't tell that this damage is for that or that or simply not a species of objection to be made in the court. So Judge Argento entered the State court judgment. It is valid and binding on this court, and I thank you for your time.
judges: Pregerson, Fletcher, Nguyen